## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITEDHEALTHCARE OF PENNSYLVANIA, INC. d/b/a UNITEDHEALTHCARE COMMUNITY PLAN,<br><br>*Plaintiff*,<br><br>vs.<br><br>NORTHSTAR ANESTHESIA OF PENNSYLVANIA LLC,<br><br>*Defendant*. | Case No. 25-cv-7187<br><br>**COMPLAINT** |

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................. 1

PARTIES .............................................................................................................. 3

JURISDICTION AND VENUE ............................................................................ 4

FACTUAL ALLEGATIONS ................................................................................ 4

    I.      Background ............................................................................................ 4

          A.    Types of Health Insurance Plans ................................................. 5

          B.    The Billing and Payment Process ............................................... 7

          C.    Out-of-Network Providers' Calculated Abuse of the Billing and Payment Process ......................................................... 9

    II.    Congress Passed the No Surprises Act to Rein in Billing Abuses by Out-Of-Network Providers Like NorthStar ........................... 12

          A.    The NSA's IDR Process ............................................................ 13

          B.    Out-of-Network Providers Intentionally Abuse the IDR Process and Thwart Congressional Intent .............................. 14

          C.    Out-of-Network Providers Like NorthStar Have Routinely Submitted Ineligible Medicare and Medicaid Claims to the NSA IDR Process ....................................................... 15

    III.   NorthStar Fraudulently Submitted an Ineligible Medicaid Claim to the NSA IDR Process .................................................................... 17

          A.    United Objected to NorthStar's Submission of the Ineligible Medicaid Claim ....................................................... 22

          B.    The IDRE (EdiPhy Advisors) Improperly Accepted the Ineligible Medicaid Claim and Entered a Decision in NorthStar's Favor ............... 24

    IV.   United Has No Adequate Recourse Under the NSA ............................ 30

CAUSES OF ACTION ......................................................................................... 31

    Declaratory Judgment Under 28 U.S.C. § 2201 ...................................... 31

Common Law Fraud ........................................................................................................... 32

PRAYER FOR RELIEF ....................................................................................................... 34

Plaintiff UnitedHealthcare of Pennsylvania, Inc. d/b/a UnitedHealthcare Community Plan ("United") hereby alleges as follows for its complaint against Defendant NorthStar Anesthesia of Pennsylvania, LLC ("NorthStar").

## INTRODUCTION

1.      Defendant has weaponized a federal law intended to shield commercially insured patients from surprise out-of-network medical bills, transforming it into a vehicle to obtain a windfall for its private equity backers.  The federal No Surprises Act ("NSA") was designed to establish a fair and balanced process—called Independent Dispute Resolution ("IDR")—for determining out-of-network reimbursement rates for services performed by certain medical providers.  Congress's goals were clear: protect patients, encourage equitable payments between out-of-network providers and commercial health plans, and rein in soaring healthcare costs. Crucially, only claims related to commercial insurance plans are eligible for this process; Medicare- and Medicaid-related claims (for which patients are already protected from surprise bills) are ineligible.

2.      NorthStar, however, is abusing the NSA by knowingly and illegally submitting ineligible claims to the IDR process, securing excessive, windfall awards to which it has no legitimate right.  This scheme has nothing to do with seeking fair payment but rather is about attempting to funnel outsized profits into the pockets of its private-equity owners, all at the expense of United and the Medicare and Medicaid programs.

3.      Congress enacted the NSA with a clear purpose: to establish an independent system to resolve payment disputes in a manner that is "fair to both providers and plans that also does not

1

increase aggregate healthcare system costs."[1]  Yet, the NSA's IDR process is now being used as a tool for exploitation by certain unethical provider groups and the private equity investors that have acquired them.  Those provider groups and their billing companies have manipulated the process, securing massive awards—oftentimes exceeding four hundred percent of the government-mandated Medicaid rates, as detailed herein—for claims that were, at all times, outside the scope and jurisdiction of the NSA's IDR process.

4.      Here, NorthStar committed fraud by knowingly providing false certifications to United, the NSA IDR entities ("IDREs"), and the U.S. Department of Health & Human Services ("HHS") that "the item(s) and/or service(s) at issue [we]re qualified item(s) and/or service(s) within the scope of the Federal IDR process."  It did so with full knowledge that the claim described herein was ineligible for the NSA's IDR process because, among other things, United's Provider Remittance Advice clearly and unequivocally informed NorthStar that the claim at issue was for a patient covered under a Pennsylvania managed Medicaid plan.

5.      Data indicates that NorthStar recently decided to make abuse of the NSA IDR process central to its business.  Prior to December 2024, United had no NSA IDR proceedings involving NorthStar.  But, in December 2024, NorthStar and its affiliated entities initiated 115 NSA IDR disputes against United.  Through the first ten months of 2025, NorthStar and its affiliated entities initiated 6,214 NSA IDR disputes against United (an average of more than 620 new disputes each month), including disputes that were ineligible for NSA IDR, like the Medicaid claim described herein.  NorthStar's abuse of the NSA IDR process is fraudulent, egregious, and

---

[1] Lawson Mansell and Sage Mehta, Niskanen Center, *New data shows No Surprises Act arbitration is growing healthcare waste* (June 18, 2025), https://www.niskanencenter.org/new-data-shows-no-surprises-act-arbitration-is-growing-healthcare-waste/#:~:text=In%20December%202020%2C%20Congress%20passed,out-of-network%20care.

intentionally designed to undermine the very integrity of the protections Congress intended to create.

6.     United brings this action to put an end to NorthStar's exploitation of the NSA IDR process.

## PARTIES

7.     Plaintiff UnitedHealthcare of Pennsylvania, Inc. d/b/a UnitedHealthcare Community Plan is a corporation organized under the laws of the Commonwealth of Pennsylvania, with its principal place of business in Pennsylvania.  United is a managed care organization contracted with the Commonwealth of Pennsylvania to arrange for the provisions of medical and related services and benefits to members of the Commonweath's Medicaid program, also known as "Medical Assistance" and/or "HealthChoices."

8.     Defendant NorthStar Anesthesia of Pennsylvania LLC is a restricted professional limited liability company that is actively registered to do business in the Commonwealth of Pennsylvania.  NorthStar's principal place of business is 6225 N. State Highway 161, Suite 200, Irving, Texas 75038-2241.  Upon information and belief, NorthStar Anesthesia of Pennsylvania LLC is owned by NorthStar Anesthesia P.A., which was originally founded in 2004 by an anesthesiologist and a certified registered nurse anesthetist practicing in the Dallas area.  In 2018, NorthStar Anesthesia P.A. was fully acquired by the Cranemere Group, a private equity firm based in New York City.  Today, NorthStar Anesthesia P.A. is one of the largest anesthesia management companies in the United States.  It currently employs over 4,000 clinicians and has agreements to provide anesthesia staffing and management services at more than 280 hospitals, ambulatory surgery centers, and other medical institutions in over 20 states, including Pennsylvania.

## JURISDICTION AND VENUE

9.      This Court has federal question subject-matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because resolution of the claims in this Complaint raises disputed and substantial questions under the NSA, a federal statute, and will require judicial interpretation of the NSA.

10.     This Court has general jurisdiction over Defendant because it maintains an active business registration in the Commonwealth and it regularly conducts business in the Commonwealth.

11.     This Court has specific jurisdiction over Defendant because this dispute arises out of, relates to, and has a substantial connection with Defendant's actions in this Commonwealth. NorthStar purposefully availed itself of this forum when it submitted claims for payment for services provided (a) to a Commonwealth resident, (b) in the Commonwealth, and (c) to an individual covered by a Pennsylvania Medicaid plan.

12.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because (a) a substantial portion of the events giving rise to the claims herein occurred within this District; and (b) the Defendant is subject to this Court's personal jurisdiction with respect to this Complaint.

## FACTUAL ALLEGATIONS

### I.      BACKGROUND

13.     In order to fully appreciate the origin and intent of the NSA, one must first understand the different types of health insurance plans offered in America, the process by which medical providers are typically paid for their services, and the ways in which "out-of-network" providers like NorthStar have historically manipulated the system through surprise medical bills that drive up healthcare costs for Americans.

### A.  Types of Health Insurance Plans

14.    Over 90% of Americans maintain some form of health insurance to help cover the costs associated with the medical care they receive from health care providers.

15.    There are three general categories of health insurance: private commercial plans, Medicare plans, and Medicaid plans.

### 1)  Private Commercial Health Insurance Plans

16.    United provides health care insurance, administration, and/or benefits pursuant to group and individual commercial plans.  These commercial plans are privately-funded either directly by United ("fully-insured" individual or group plans) or by employers who wish to offer commercial health insurance for their employees and their families ("self-funded employer sponsored" group plans).

17.    Notably, it is **only** claims submitted to and paid by qualifying commercial health plans that are eligible for the NSA's IDR process.[2]

### 2)  Medicare and Medicare Advantage Plans

18.    Medicare is a federally-funded health insurance program managed by the Centers for Medicare & Medicaid Services ("CMS") within HHS.  Medicare is generally available for all individuals aged 65 and over.[3]

19.    Medicare-eligible individuals may select from two primary forms of Medicare coverage.  First, there are Medicare Parts A & B, which are managed directly by CMS.  Second, Medicare-eligible individuals can alternatively elect to participate in Medicare Part C, also known

---

[2] *See* 42 U.S.C. §§ 300gg-111(c)(1)(A).
[3] There are some categories of individuals who may be eligible for Medicare prior to the age of 65, such as individuals with a qualifying disability (e.g., end-stage renal disease or amyotrophic lateral sclerosis) or individuals receiving social security disability insurance benefits for 24 months.

as "Medicare Advantage."  That program was enacted by the federal government to allow Medicare Advantage organizations like United, who are pre-approved by CMS, to provide insurance coverage for Medicare beneficiaries who choose to enroll in a privately administered Medicare Advantage plan.

20.    The federal government, through CMS, sets the rates that providers must accept for treating Medicare patients.[4]  Because providers are obligated to accept the CMS-mandated rates, the NSA IDR process is inapplicable to Medicare-related claims.[5]

### 3)    Medicaid and Managed Medicaid Plans

21.    The Medicaid program is a jointly funded federal and state program that generally provides health insurance to low-income state residents who meet certain eligibility criteria.  While each state operates its own state-based Medicaid program, the federal government (through CMS) provides funding to the states for those programs.  Some states manage and administer their own Medicaid plans.  Many other states contract with private managed care organizations ("MCOs"), such as United, who agree to provide coverage under privately managed Medicaid plans, similar to the Medicare Advantage program described above.

22.    Pennsylvania's Medicaid program provides access to health care for nearly three million people in Pennsylvania, including certain qualifying children, pregnant women, adults, and

---

[4] Healthcare providers can elect whether they want to participate in Medicare.  "Medicare 'participation' means you agree to accept claims assignment for all Medicare-covered services to your patients.  By accepting assignment, you agree to accept Medicare-allowed amounts as payment in full.  You may not collect more from the patient than the Medicare deductible and coinsurance or copayment."  *See Annual Medicare Participation Announcement*, Centers for Medicare & Medicaid Services, https://www.cms.gov/medicare-participation (last visited Dec. 8, 2025).

[5] "The Federal IDR process **does not apply** to items and services payable by Medicare, Medicaid, the Children's Health Insurance Program, or TRICARE."  *Chart for Determining the Applicability for the Federal Independent Dispute Resolution (IDR) Process*, Centers for Medicare & Medicaid Services (Jan. 13, 2023), https://www.cms.gov/files/document/caa-federal-idr-applicability-chart.pdf.

people with disabilities.[6]  Pennsylvania is among those states that choose to have their Medicaid program managed by private MCOs; currently the Commonwealth contracts with several different MCOs, including United.

23.     United contracts with the Commonwealth to manage Pennsylvania's Medicaid program in exchange for a fixed per-member-per-month payment.  When a covered individual receives medical services, United makes payments to the healthcare providers using these funds in accordance with Pennsylvania's Medicaid fee schedules governing rates of payment to providers.

24.     Similar to Medicare, healthcare providers must accept the Commonwealth's mandated rates for services provided to Medicaid beneficiaries.  In fact, for certain Medicaid claims, in the event that a provider obtains any payment beyond the amount so authorized, Pennsylvania law expressly requires that provider to return any such supplemental payment.[7] Because providers are obligated to accept the Medicaid rates, the NSA IDR process is inapplicable to Medicaid-related claims.[8]

**B.  The Billing and Payment Process**

25.     As demonstrated above, there are different categories of insurance plans (commercial, Medicare Advantage, managed Medicaid), each with a variety of different benefit designs.  For example, while one health plan may fully cover a certain procedure, another health plan may have only limited coverage or no coverage at all.  Given this variability, it is important

---

[6] *See Medicaid in Pennsylvania*, KFF (May 2025), https://files.kff.org/attachment/fact-sheet-medicaid-state-PA.

[7] *See* 62 P.S. § 1406(a) ("All payments made to providers under the medical assistance program shall constitute full reimbursement to the provider for covered services rendered."); 55 Pa. Code § 1101.63(a) ("A provider who seeks or accepts supplementary payment of another kind from the Department, the recipient or another person for a compensable service or item is required to return the supplementary payment.").

[8] *See id*.

for providers to obtain and verify a patient's insurance information, typically through the patient's insurance card.  Among other things, the insurance card identifies which insurance plan should be billed for the health care services and what category of insurance the patient has (i.e., commercial, Medicare Advantage or managed Medicaid).  Health care professionals rely on this information in order to bill for the care they provide.  Indeed, it is why patients are asked to show their ID and health insurance card when they check in at a provider's office for medical care.

26.     After they provide medical services to patients, providers submit claims for payment to health insurers on standardized claim forms.  Today, these claim forms are usually submitted electronically.  Claim forms include, among other items, specific information about the patient, the medical provider who rendered the care at issue, the healthcare services provided, and the amount charged by the provider.

27.     The patient's insurer then processes the claim by first determining whether the patient is a member of one of the benefit plans offered by the insurer.  If the patient has coverage under one of the insurer's plans, the insurer assesses the benefits available through the patient's specific insurance plan for the services at issue.  Based on the terms of the patient's specific plan, the insurer makes a determination about whether the claim is covered, how much of the claim, if any, must be paid by the patient (for example, a patient might be responsible for copays, coinsurance, and/or the full cost of services if she has not yet met her annual deductible), and how much the health plan will ultimately pay for the patient's care.

28.     After the health insurer makes these coverage and payment determinations, the insurer issues an Explanation of Benefits ("EOB") to the patient and a Provider Remittance Advice ("PRA") to the medical provider.  The EOB and PRA explain to the patient and the provider, respectively, how the specific claim was processed and paid.  Both the EOB and PRA identify the

amount billed by the provider, the amount allowed by the health plan based on the benefits available under the patient's specific insurance plan, the amount paid by the patient's plan, the amount owed by the patient, and the reasoning for the insurer's payment determination.

**C. Out-of-Network Providers' Calculated Abuse of the Billing and Payment Process**

29.    In most cases the aforementioned billing and payment process is predictable for providers and affordable for patients.

30.    As noted, Medicare- and Medicaid-related plans have rates established by the federal and state authorities charged with overseeing those programs.  Medicare- and Medicaid-related plans pay the established rates and providers must accept those rates without billing patients for any additional amounts.

31.    And patients with commercial insurance plans usually receive care from medical providers who have agreed on predetermined rates with insurance companies.  Specifically, United negotiates set rates for care provided by a broad network of credentialed healthcare professionals who offer United's commercial plan members quality, affordable health care services.  Healthcare providers who are part of United's network are called "in-network" providers.  In-network providers enter into agreements with United that, among other things, govern the amount that United and United's commercial plan members will pay for healthcare services.  When a United member receives services from an in-network provider, the provider is prohibited from billing above the predetermined network rate.  As a result, the billing and payment process is predictable; in-network providers must accept the predetermined network rates without billing patients for any additional amounts.

32.    However, there are certain medical providers, known as "out-of-network" providers, who have not entered into an agreement with United.  United has not performed

credentialing on these providers, nor has it agreed to pay these providers any predetermined amount for services rendered to commercially insured patients.

33.     Fortunately, commercially insured patients can generally avoid the unpredictable costs associated with out-of-network providers.  Patients most often seek out and receive services from medical providers who are in-network with their health insurance plans.  And in the rare instance where a patient does seek care from an out-of-network provider, it is almost always by choice and with knowledge of the costs and complications involved with out-of-network care.

34.     But in some situations, patients have no ability to control who provides their medical care.  For instance, a patient may carefully schedule her surgery with an in-network surgeon at an in-network hospital but be unaware that the hospital staffs its operating rooms with independent contractor anesthesiologists and radiologists who have refused to enter into network agreements with health insurance companies like United.  In this scenario, the patient reasonably (though incorrectly) assumes that all health care professionals working at the in-network hospital are also in-network with her insurance plan.  The patient has no way of knowing that the anesthesiologist and radiologist involved in her surgery are out-of-network until it is too late.

35.     Out-of-network providers are not limited in the amounts that they can charge for medical services provided to commercial health plan members; they set their rates however they want and without any logical connection to (a) their actual costs for delivering care, or (b) prevailing market rates and competitive dynamics.

36.     Out-of-network providers know, however, that the patient's commercial health insurance plan is not obligated to pay their full billed charges.  Rather, payments for out-of-network services are governed by the terms of the patient's specific commercial insurance plan. The out-of-network reimbursement varies from plan to plan—while some pay a percentage of the

applicable Medicare rate, others pay the average in-network rate for a given market, and yet others pay a percentage of the provider's billed charges.

37.    Despite knowing that commercial health insurance plans will not pay their full billed charges, out-of-network providers routinely submit astronomically high bills to commercial health insurance plans.  Insurers process out-of-network provider bills in accordance with the terms of the patient's specific commercial insurance plan, which results in a payment that is less than the amount of the out-of-network provider's full billed charge.  This results in a "balance" that is left unpaid.

38.    Historically, out-of-network providers would often "balance bill" commercially insured patients for the difference between their charged amount and the amount the commercial health plan allowed.  From the patient's perspective, this bill came as a surprise, hence the term "surprise billing" (the balance/surprise bill was in addition to the amount the health insurance plan covered and any amounts the patient had already paid in copays, coinsurance and/or deductible).

39.    These balance bills were oftentimes massive and financially devastating for patients.  To give just a few examples related specifically to NorthStar:

- A teacher giving birth at an in-network hospital received anesthesia from an out-of-network NorthStar provider.  NorthStar sent the teacher a surprise balance bill for nearly $6,000.  Only after NBC News reported on NorthStar's abuse did NorthStar agree to reduce the bill to $170—*a 97% reduction*.[9]

- NorthStar sent another patient a surprise balance bill for $13,000 for anesthesia services during an organ transplant.  The patient was donating a kidney to his

---

[9] *See* Wayne Carter and Amanda Lane, "Woman Billed for Out-of-Network Doctor at Her In-Network Hospital," NBC 5 (January 16, 2017), https://www.nbcdfw.com/news/local/woman-billed-for-out-of-network-doctor-at-her-in-network-hospital/19218/.

cousin.  After news of NorthStar's abuse hit the press, the patient "received a phone

call from the CFO of NorthStar saying they would 'take care of the bill.'"[10]

Unfortunately, however, most NorthStar patients were not so lucky and were forced to pay

NorthStar's inflated surprise bills or risk aggressive collection efforts.

## II.    CONGRESS PASSED THE NO SURPRISES ACT TO REIN IN BILLING ABUSES BY OUT-OF-NETWORK PROVIDERS LIKE NORTHSTAR

40.    Congress recognized that providers like NorthStar held "substantial market power"

and "face[d] highly inelastic demands for their services because patients lack[ed] the ability to

meaningfully choose or refuse care."[11]  Thus, providers like NorthStar could "charge amounts for

their services that … result[] in compensation far above what is needed to sustain their practice."[12]

Congress noted that this "market failure" was having "devastating financial impacts on Americans

and their ability to afford needed health care."[13]

41.    Congress enacted the NSA, effective January 1, 2022, "to protect consumers from

surprise medical bills."[14]  The NSA prohibits certain out-of-network healthcare providers—

including emergency services providers and facilities, providers of non-emergency services

operating at in-network facilities, and air ambulance providers—from engaging in surprise billing

to members of private commercial health plans.[15]

42.    Congress believed "that any surprise billing solution must comprehensively protect

---

[10] *See "*Man Left With $13,000 Bill After Donating Kidney To Family Member," Newsweek (February 11, 2022), https://www.newsweek.com/man-left-13000-bill-after-donating-kidney-family-member-1678400.  NorthStar's eagerness to abandon its outrageous collection efforts in the face of public scrutiny exposed the fictitious nature of NorthStar's greed-driven billed charges and revealed that NorthStar's charged amounts had no relation to its true costs of delivering the services.

[11] Ban Surprise Billing Act, H.R. Rep. No. 116-615 (2020), at 53.

[12] *Id.*

[13] *Id.* at 52-53.

[14] *Id.* at 47.

[15] *See* 42 U.S.C. §§ 300gg-131, 300gg-132, 300gg-135.

consumers by 'taking the consumer out of the middle' of surprise billing disputes."[16]  Through passage of the legislation, Congress required healthcare providers (including hospitals and doctors) and payors (including insurance companies and self-funded employer sponsored plans) to attempt to resolve billing and payment disputes amongst themselves.[17]

43.    Thus, as part of the NSA, Congress created a specific framework for health plans and providers to resolve specific types of *eligible* surprise billing disputes.[18]  That framework, called IDR, was designed to establish a fair and balanced process for determining out-of-network reimbursement rates from commercial health plans for enumerated types of out-of-network services.

### A.  The NSA's IDR Process

44.    If an out-of-network provider disputes the initial payment received from a commercial health plan, the parties are first required to participate in a 30-business-day "open negotiation" to try and resolve the dispute.  Should that fail, either party has four business days to commence IDR, seeking a binding payment determination from a certified IDRE.

45.    For valid, eligible commercial insurance claims, the IDR process is a binding "baseball-style" dispute resolution.  The NSA requires the provider and insurer to each submit a proposed reimbursement amount and explanation to the IDRE.[19]  The IDRE then selects one of the two proposed amounts, taking into account various criteria.[20]  One of these criteria is the qualifying payment amount ("QPA"), which is a calculation that represents the median in-network

---

[16] H.R. Rep. No. 116-615, at 55.
[17] *See* Brady Opening Statement at Full Committee Markup of Health Legislation (Feb. 12, 2020), available at https://waysandmeans.house.gov/2020/02/12/brady-opening-statement-at-full-committee-markup-of-health-legislation-3/.
[18] *See* 42 U.S.C. § 300gg-111(c).
[19] *See* 42 U.S.C. § 300gg-111(c)(5)(B).
[20] *See id.* § 300gg-111(c)(5)(C)(i).

rate for a given service rendered by the same or similar medical provider in a given region. Congress expected that most items and services submitted to IDR would be paid at or around the QPA. Indeed, Congress' intent was to make the QPA a key metric in the NSA IDR process as opposed to an out-of-network provider's "billed charges," because Congress recognized that the out-of-network providers' billed charges were arbitrary amounts with no relation to the amounts health plans or individuals usually paid for the same services.[21]

46.     Congress intended that this system would function in a manner that was "fair to both providers and plans [and] that also does not increase aggregate healthcare system costs."[22] It also intended that the IDR system would be used *relatively infrequently*. In the regulations establishing the IDR system, federal agencies estimated that the IDR process would annually resolve 17,333 disputes, with an additional 4,899 disputes from air ambulance providers.[23] The reality, though, has been very different.

## B. Out-of-Network Providers Intentionally Abuse the IDR Process and Thwart Congressional Intent

47.     To say that out-of-network providers have filed far more IDR cases than anticipated would be a gross understatement. In only the first nine months after the IDR system opened in 2022, about 190,000 disputes were filed—more than *ten times* the number expected for the first full year alone.[24] The number of claims submitted to IDR has only increased. From mid-2022 to

---

[21] *See* Requirements Related to Surprise Billing: Part II, 86 Fed. Reg. 55996 (Oct. 7, 2021) (median contracted rates typically represent reasonable market values because they "are established through arms-length negotiations between providers and facilities and plans and issuers (or their service providers).")

[22] Lawson Mansell and Sage Mehta, *New data shows No Surprises Act arbitration is growing healthcare waste*, Niskanen Center (June 18, 2025), https://www.niskanencenter.org/new-data-shows-no-surprises-act-arbitration-is-growing-healthcare-waste/.

[23] *See* Requirements Related to Surprise Billing: Part II, 86 Fed. Reg. at 56066, 56069 (Oct. 7, 2021).

[24] *See* Jack Hoadley and Kennah Watts, *The Substantial Costs Of The No Surprises Act Arbitration Process*, HealthAffairs (Aug. 25, 2025),

May 2025, more than ***3.3 million*** disputes were filed.[25]  Private equity-backed providers were responsible for filing a majority of these disputes.[26]  And far from leading to fair outcomes, the IDR process has been incredibly biased in favor of out-of-network providers.  In 2024, for example, IDREs sided with out-of-network providers in 85% of claims decided.[27]

48.    Not only do IDREs side with providers most of the time, but when they do, they almost always issue awards that are ***three to four times*** the QPA that Congress expected would prevail in most IDR proceedings.  In the fourth quarter of 2024, the median amount awarded by IDREs was 459% of the QPA.[28]

49.    Far from reining in soaring health care costs as Congress intended, the unforeseen volume of claim submissions and the outsized awards IDREs have routinely issued in favor of providers have had dramatic monetary costs for the healthcare system and patients.  Ironically, the NSA IDR system has ***added at least $5 billion*** to overall health system costs since its inception—approximately $2 to $2.5 billion per year.[29]

### C.  Out-of-Network Providers Like NorthStar Have Routinely Submitted Ineligible Medicare and Medicaid Claims to the NSA IDR Process

50.    One of the many things that Congress did not foresee in enacting the NSA was that providers like NorthStar would purposefully, fraudulently, and in violation of federal law submit clearly ineligible claims to IDR.  Nor could Congress have foreseen that IDREs (who are certified

---

https://www.healthaffairs.org/content/forefront/substantial-costs-no-surprises-act-arbitration-process.
[25] *Id.*
[26] *See Profiting on all Sides: Private Equity and the No Surprises Act*, Private Equity Stakeholder Project (Nov. 5, 2025), https://pestakeholder.org/news/profiting-on-all-sides-private-equity-and-the-no-surprises-act/#_ftn3.
[27] *See* Note 24, *supra.*
[28] *Id.*
[29] *Id.*

by CMS and should, therefore, be able to readily distinguish between an eligible commercial insurance claim and an ineligible Medicare or Medicaid claim) would blatantly ignore evidence of ineligibility, routinely exceed their jurisdiction, and issue 85% of decisions in favor of providers at amounts that are four hundred percent or more of the QPA that Congress intended would prevail in most disputes.  Unfortunately, the NSA IDR system has perverse financial incentives that encourage providers to submit, and IDREs to improperly accept, ineligible claims.  In fact, current data shows that ineligible claims constitute about 20% of all closed IDR disputes.[30]

51.    This is a clear violation of the NSA.  The IDR process is not available for services provided to patients covered by Medicare- or Medicaid-related plans.  Rather, the process only applies to services furnished to patients covered by a private commercial "group health plan or health insurance issuer offering group or individual health insurance coverage."[31]

52.    This fact could not come as a surprise to any healthcare provider or IDRE.  Indeed, CMS—the federal agency that is primarily charged with administering the IDR process—has issued several resources to aid parties in determining whether a claim is eligible for IDR.  These resources clearly explain that "[t]he Federal IDR process ***does not apply*** to items and services payable by Medicare, Medicaid, the Children's Health Insurance Program, or TRICARE."[32]

53.    Notwithstanding the clear limits of the NSA IDR process, out-of-network providers like NorthStar continue to fraudulently submit ineligible Medicare- and Medicaid-related claims in hopes of scoring exorbitant recoveries.

---

[30] *Id.*

[31] 42 U.S.C. § 300gg-111(c)(1)(A).

[32] *See, e.g., Chart for Determining the Applicability for the Federal Independent Dispute Resolution (IDR) Process*, Centers for Medicare & Medicaid Services (Jan. 13, 2023), https://www.cms.gov/files/document/caa-federal-idr-applicability-chart.pdf.

### III.    NORTHSTAR FRAUDULENTLY SUBMITTED AN INELIGIBLE MEDICAID CLAIM TO THE NSA IDR PROCESS

54.    The following example is emblematic of NorthStar's fraudulent abuse of the NSA IDR process.

55.    On January 29, 2025, a 32 year-old patient gave birth at St. Mary Medical Center, in Langhorne, Pennsylvania ("St. Mary's").    This patient was insured through the UnitedHealthcare Community Plan, a managed Medicaid plan.

56.    When a Medicaid recipient receives medical care, they have to show the medical provider their insurance card.  The card for the patient enrolled in United's Pennsylvania managed Medicaid plan would have looked substantially similar to the following, with a line identifying the patient's Medicaid identification number:

 

57.    While at St. Mary's, the patient received services from a NorthStar-affiliated anesthesiologist.

58.    Upon information and belief, NorthStar handles its own billing and submits claims for reimbursement on its own behalf to United.  Because NorthStar has a relationship with St. Mary's to provide anesthesia services to admitted patients, NorthStar should have received the patient's insurance information from St. Mary's and, therefore, should have known that the patient was insured under Pennsylvania's Medicaid program.

59.    On February 7, 2025, NorthStar submitted a claim to United for the anesthesia services provided to the patient.[33]   The total charged amount for the anesthesia services was $6,450.00.

60.    Upon receiving the claim, United determined that the patient was a member of its Pennsylvania managed Medicaid plan.  Accordingly, United calculated the government-mandated reimbursement amount for the anesthesia care provided to patients covered by the Pennsylvania Medicaid program, which was $1,440.72.  Specifically, United calculated the appropriate payment for this claim according to the Pennsylvania Department of Human Services fee schedule. Payment for anesthesia claims is calculated by multiplying the number of total anesthesia units by the Pennsylvania Medicaid conversion factor.   In this case, 92 total units[34] multiplied by the Pennsylvania Medicaid conversion factor of $15.66 resulted in a proper payment of $1,440.72.

61.    On February 22, 2025, United paid NorthStar the government-mandated amount of $1,440.72.  With its payment, United sent NorthStar a PRA providing details on the patient, the patient's status as a member of a Medicaid plan, the claim, and United's reimbursement:

---

[33] For unknown reasons, NorthStar submitted the claim to United using "UHC Choice Plus" as the patient's insurance plan (UHC Choice Plus is a commercial PPO plan).  Whether this was in error or intentionally fraudulent is of no import here, as NorthStar certainly must have known that the patient was a Medicaid recipient no later than when United sent its PRA, as described below.

[34] Total units are primarily made up of base units, which are a fixed number of units assigned to a particular procedure, and timed units, which are calculated based on fifteen-minute increments of anesthesia time.  For the relevant claim, there were 5 base units and 86 timed units.  One additional unit was added because of the physical location of the anesthesia services, bringing the total to 92 units.



62.     The PRA was printed on the letterhead of the UnitedHealthcare Community Plan, a managed Medicaid plan.  And the PRA noted that NorthStar had made a claim against a "PA Medicaid" plan:

> **PATIENT ACCOUNT:**
> **PRODUCT DESC.:**     PA Medicaid Healthy Plus No Copay No limits GoldStar
> **BILLING NPI:**         1700218989
> **CARRIER ID:**

63.     The PRA also informed NorthStar that "[b]illing or balance billing UnitedHealthcare Community Plan Medicaid members is prohibited and may violate federal and state medical assistance rules and regulations."

64.     The PRA also noted that "UnitedHealthcare enrolls members through the Medicare, Medicaid or Medicaid-expansion programs and payment for the services our members receive is payment in full – balance billing, other than co-pays and deductibles, is prohibited.  By accepting payment from UnitedHealthcare, the provider agrees to abide by the laws, regulations and agency policies that govern such programs, including the prohibitions on fraud, waste and abuse."  As detailed below, the Commonwealth of Pennsylvania's Medicaid program explicitly prohibits

19

fraud, waste and abuse, and its contracts with MCOs like United contain various provisions designed to prevent payment for fraudulent, abusive and wasteful claims.

65.    The PRA also provided detailed procedures to appeal United's payment.  These procedures provided, in part, that "Disputes from participating providers must be made within forty-five (45) days of the date of the UnitedHealthcare Community Plan Remittance Advice and must be submitted [on the stated website.]  . . .  The appeal must include a letter detailing the dispute, a copy of the Remittance Advice, and related medical records and/or other supporting information.  Non-participating providers may appeal within one hundred eighty (180) days in [prescribed format and submitted in the prescribed manner]."

66.    NorthStar never appealed United's payment on the claim.

67.    Even though the insurance cards and PRA clearly showed that the patient was a member of a managed-Medicaid plan and therefore ineligible for the NSA IDR process, on April 15, 2025, NorthStar initiated an IDR dispute, through its agent HaloMD, LLC ("HaloMD").

68.    HaloMD is a medical management company based in Texas specializing in NSA disputes.  HaloMD's website characterizes HaloMD as "[a] [p]ioneering [f]orce" in IDR, managing IDR for "thousands of healthcare providers across the country" and leveraging "proprietary technology, advanced analytics, and deep specialty expertise" to achieve success in the IDR process for providers.[35]  HaloMD works for providers like NorthStar for a contingent fee. Providers, like NorthStar, using HaloMD's services submit the dispute in the IDR process through HaloMD's portal.  As part of that process, HaloMD represents that it "gathers and organizes the

---

[35] *See Home*, https://halomd.com/ (last visited Dec. 8, 2025); *About Us*, https://halomd.com/about-us/ (last visited Dec. 8, 2025).

necessary documentation [from the provider], [and] prepar[es] a compelling case that highlights the provider's position, ensuring nothing is overlooked."[36]

69.    The Notice of IDR Initiation stated that the QPA for the disputed claim was $1,440.72—i.e., the exact amount United had already paid in accordance with Pennsylvania's Medicaid fee schedule.

70.    Shockingly, however, NorthStar sought $7,075.00 for the disputed claim, which was nearly *five times* what NorthStar itself identified as the QPA and *$625.00 more* than the $6,450.00 NorthStar had initially billed to United.  Upon information and belief, NorthStar added $625.00 to its original billed amount as a way to help it cover HaloMD's contingent fee.

71.    NorthStar, through HaloMD, initiated the IDR proceeding via an online federal web portal that includes a notice that providers must submit an "[a]ttestation that qualified IDR items or services are within the scope of the Federal IDR process."

---

[36] *Id.*  HaloMD is among the three most prolific filers of IDR process disputes.  During the last six months of 2024, HaloMD initiated 134,318 disputes through the IDR process—which by itself exceeded the government's original estimate for total annual disputes *more than sixfold*. *See Federal IDR Supplemental Tables for Q3 2024*, Centers for Medicare & Medicaid Services (May 28, 2025), https://www.cms.gov/files/document/federal-idr-supplemental-tables-2024-q3.xlsx; *Federal IDR Supplemental Tables for Q4 2024*, Centers for Medicare & Medicaid Services (May 28, 2025), available at https://www.cms.gov/files/document/federal-idr-supplemental-tables-2024-q4-may-28-2025.xlsx.  That means HaloMD initiates an average of more than *733 disputes* against health plans per day.  *Id.*

> Along with the general information you'll need to start your Federal IDR dispute process, provide:
> - Information to identify the qualified IDR items or services (and whether they are designated as batched or bundled items or services)
> - Dates and location of qualified IDR items or services
> - Type of qualified IDR items or services such as emergency services and post-stabilization services
> - Codes for corresponding service and place-of-service
> - Attestation that qualified IDR items or services are within the scope of the Federal IDR process
> - Your preferred certified IDR entity

72.    In initiating the dispute at issue here, NorthStar fraudulently attested, through its agent HaloMD, that the "the item(s) and/or services at issue [we]re qualified item(s) and/or service(s) **within the scope of the Federal IDR process**."  (emphasis added).

> **Third Party Attestation:**
> Yes
>
> **Conflict of Interest Attestation**
> ☑ I, the undersigned initiating party (or representative of the initiating party), attest that to the best of my knowledge the preferred certified IDR entity does not have a disqualifying conflict of interest and that the item(s) and/or service(s) at issue are qualified item(s) and/or service(s) within the scope of the Federal IDR process.
>
> **Signature:**                                      **Date:**
> HaloMD ASD                                      04/15/2025

## A. United Objected to NorthStar's Submission of the Ineligible Medicaid Claim

73.    The very next day, on April 16, 2025, United responded by attesting that the claim was "***not eligible for IDR under the NSA*** because this Member is enrolled in a Medicare, Medicaid, Children's Health Insurance Program, or TRICARE plan."  (emphasis added).

**Federal IDR Process Applicability Attestation**

I (We), the undersigned non-initiating party, attest that the Federal IDR process is NOT applicable to the items and services under dispute.

**If you attested to this statement, select one or more justifications to support why the items and services under dispute do not belong in the Federal IDR Process.**

☑ Other.

**Please explain why you believe the federal IDR process does not apply and upload supporting materials if applicable.**

Claim No(s). RA3530443100 are not eligible for IDR under the NSA because this Member is enrolled in a Medicare, Medicaid, Children's Health Insurance Program, or TRICARE plan.

**Upload files**

File Name - PRA.pdf

**Additional information to justify your selection:**

| Non-Initiating party: | Date: |
| --- | --- |
| UnitedHealthcare | 04/16/2025 |

74.    United attached the PRA for the claim, which (as discussed in paragraphs 61-65, *supra*) made clear that the services were provided to a patient insured under a Pennsylvania ***Medicaid*** plan.

75.    On May 2, 2025, United sent a letter to the selected IDRE, EdiPhy Advisors, L.L.C. ("EdiPhy Advisors"), reiterating that the claim was "not eligible" for IDR adjudication because "this Member is enrolled in [] Medicaid."



05/02/2025

IDR File Number:    DISP-3004314
Provider/Facility:    NORTHSTAR ANESTHESIA OF PENNSYLVANIA, LLC (Provider)

Dear EdiPhy Advisors, L.L.C,

We appreciate your engagement with this matter. As a preliminary matter, we believe that this dispute is not eligible for the Federal Independent Dispute Resolution (IDR) program under the No Surprises Act (NSA).

**The Provider's Claims Are Ineligible for IDR under the NSA**

The claim(s) below do not qualify for the Federal IDR program under the NSA for the following reason(s).

> Claim No(s). RA3530443100 are not eligible for IDR under the NSA because this Member is enrolled in a Medicaid.

\* \* \*

*For the reasons set forth above, we respectfully request that the IDRE determine that this dispute is ineligible for IDR.  We also respectfully request that the IDRE determine that, as the prevailing party, we are entitled to a refund of the IDRE fees it paid in connection with this dispute.*

We thank you for your time and assistance with this matter.

Respectfully submitted,

UnitedHealthcare Community Plan

_____

**B.  The IDRE (EdiPhy Advisors) Improperly Accepted the Ineligible Medicaid Claim and Entered a Decision in NorthStar's Favor**

76.    On May 24, 2025, after allegedly "considering all permissible information submitted by both parties," the IDRE inexplicably determined the claim in favor of NorthStar and ordered United to pay NorthStar the full amount sought, ***$7,075.00—$625.00 more than***

*NorthStar had originally billed and $5,634.28 more than the Pennsylvania-mandated Medicaid rate that NorthStar was required to accept for treating the Medicaid member at issue.*[37]

77.    The IDRE made no explicit determination that the claim was eligible for IDR resolution.

78.    The IDRE "note[d] that [United] only submitted an objection to the eligibility of the dispute and did not submit any other persuasive argument in its favor."  Of course, United had no obligation to submit anything other than an objection because the Medicaid claim at issue was ineligible for NSA IDR and, consequently, the IDRE had no jurisdiction or authority over the dispute.

79.    The IDRE's determination made no reference to United's multiple submissions explaining the claim was against a Medicaid plan, including the PRA, which noted that the patient received benefits under "PA Medicaid," evidence that EdiPhy Advisors refused to adequately consider pertinent and material evidence and thereby prejudiced United's rights.

### 1)  The IDRE Never Had Any Jurisdiction Over the Medicaid Claim Submitted by NorthStar

80.    IDREs like EdiPhy Advisors must be certified by CMS and, as part of that certification process, must "demonstrate **expertise** in …: arbitration and claims administration, managed care, billing and coding, medical, [and] legal (including healthcare law)."[38]

81.    HHS, the Department of Labor, and the Department of the Treasury (the "Departments") have issued guidance to IDREs titled "Federal Independent Dispute Resolution (IDR) Process Guidance for Certified IDR Entities."  The most recent December 2023 Guidance

---

[37] *See* 62 P.S. § 1406(a); 55 Pa. Code § 1101.63.

[38] *Apply to Become a Certified Independent Dispute Resolution Entity*, Centers for Medicare & Medicaid Services, https://www.cms.gov/nosurprises/help-resolve-payment-disputes/apply (last visited Dec. 8, 2025).

directs: "In addition to checking for and submitting an attestation regarding conflicts of interest, the **certified IDR entity must determine whether the Federal IDR Process applies to the items and services that are the subject of the dispute**.  The Federal IDR process **does not apply** to items and services payable by Medicare, Medicaid, the Children's Health Insurance Program, or TRICARE."  (emphasis in original).[39]

82.    Given that their authority and jurisdiction necessarily derives from the NSA and is, therefore, necessarily limited to only eligible disputes related to commercial insurance claims, IDREs are required by regulation to "determine whether the Federal IDR process applies" ***before*** proceeding with a claim.[40]

83.    Only after an IDRE satisfies its statutory obligation to determine whether a claim is eligible for the IDR process and within its jurisdiction can an IDRE proceed to a payment determination.[41]

84.    Here, there is no doubt that the IDRE (EdiPhy Advisors) was derelict in its duty to determine eligibility of the Medicaid claim submitted by NorthStar.  Indeed, given that it is certified by CMS as having expertise in managed care, it defies logic that EdiPhy Advisors could have confused the ineligible Medicaid claim at issue with a commercial insurance claim subject to the NSA.

---

[39] *Federal Independent Dispute Resolution (IDR) Process Guidance for Certified IDR Entities*, Centers for Medicare & Medicaid Services (Dec. 2023), https://www.cms.gov/files/document/federal-idr-guidance-idr-entities-march-2023.pdf.
[40] 45 C.F.R. § 149.510(c)(1)(v).
[41] *See* 42 U.S.C. § 300gg-111(c)(5)(A).

      2)    **The IDRE's Actions and Ultimate Decision Demonstrate Bias Against United**

85.    EdiPhy Advisors' inability to distinguish between ineligible Medicaid claims and eligible commercial insurance claims raises serious doubts about whether it has the requisite expertise to continue to qualify as a certified IDRE.  Beyond that, however, there are reasons to question its objectivity and motives.

86.    Pursuant to the NSA, IDREs are compensated on a per-claim basis.  The commercial insurance plan and the out-of-network provider must each pay a non-refundable administrative fee of $115 when a dispute is initiated.  This amount is typically not recoverable even if the IDRE determines that the dispute is ineligible for IDR.  In addition, both parties pay an IDRE fee **before** the IDRE accepts a dispute and makes the payment determination.  The IDRE fee is set by the specific IDRE and depends on the type of dispute, but in 2025 IDRE fees range from $375 to $1,150.[42]  EdiPhy charges the highest fees of any IDRE entity—$800 for single claim determinations and $1,150 for batches of 2 to 25 claims.[43]  If the dispute is accepted for IDR and a final decision is entered, the party whose offer is selected by the IDRE is refunded its IDRE fee (meaning it is only responsible for its $115 administrative fee).  The non-prevailing party is responsible for both its administrative fee and the IDRE fee.  From 2022 to 2024, administrative and IDRE fees totaled $885 million (approximately $228 million in administrative fees and $656 million in IDRE fees).[44]

---

[42] *See List of Certified Independent Dispute Resolution Entities*, Centers for Medicare & Medicaid Services, https://www.cms.gov/nosurprises/help-resolve-payment-disputes/certified-idre-list (last visited Dec. 8, 2025).
[43] *Id*.
[44] *See* Note 24, *supra*.

87.     IDREs are only compensated when they resolve a claim on the merits.[45]  If an IDRE rejects a claim because it is ineligible under the NSA, they receive ***no compensation*** on that claim.[46]

88.     This compensation structure thus creates an incentive for IDREs to exceed their authority and jurisdiction under the NSA by wrongfully accepting and adjudicating claims that are actually ineligible for NSA IDR.

89.     It also incentivizes IDREs to rule in favor of providers because HHS statistics show that providers are responsible for initiating all but an insignificant handful of IDR proceedings. Indeed, providers and facilities initiated 478,799 of 478,849 (99.99%) NSA IDR disputes recorded by CMS during the fourth quarter of 2024 alone.[47]  Thus, if IDREs reject a dispute as ineligible for IDR or if they select the health plan's rate proposal, the IDRE is biting the proverbial hand that feeds the IDR pipeline.  The fact that IDREs are siding with out-of-network providers in 85% of disputes—and awarding four to five times the QPA when doing so—demonstrates that IDREs are biased in favor of out-of-network providers like NorthStar.  The bias becomes clearer once one realizes that, of the fifteen IDREs certified by CMS, five backed by private equity firms.[48]

90.     The fact that EdiPhy Advisors blatantly exceeded its authority and jurisdiction under the NSA in issuing an illegal award purporting to require United to pay $7,075.00 on the ineligible Medicaid claim described herein (for which NorthStar was only entitled to payment of $1,440.72 under Pennsylvania's Medicaid fee schedule) is evidence of EdiPhy Advisors' partiality and corruption.

---

[45] *See* 42 U.S.C. § 300gg-111(c)(5)(F).
[46] *See id.*
[47] *Federal IDR Supplemental Tables 2024 Q4*, Centers for Medicare & Medicaid Services, (May 28, 2025) https://www.cms.gov/nosurprises/policies-and-resources/Reports.
[48] *See* Note 26, *supra*.

### 3) Compliance With the IDRE's Illegal Decision Would Require United to Pay Fraudulent, Abusive and Wasteful Rates That are Inconsistent with the PA Medicaid Fee Schedule and United's Medicaid Contract with the Commonwealth

91.    As discussed above, United is contracted as a Medicaid MCO with the Commonwealth of Pennsylvania.  The contract governing United's service as a MCO is the Pennsylvania HealthChoices Agreement.

92.    United must adhere to certain explicit "Program Requirements" set forth in the HealthChoices Agreement, including specific obligations requiring United to have adequate policies and procedures for the "prevention, detection and investigation" of "Fraud, Waste and Abuse."[49]  In fact, as a contracted Medicaid MCO in Pennsylvania, United has a "primary purpose of preventing, detecting, reducing, investigating, referring and reporting suspected Fraud, Waste and Abuse that may be committed by … Providers … Caregivers … or other third parties[.]"[50]

93.    The amount NorthStar requested, and that the IDRE awarded, for the ineligible Medicaid claim submitted to NSA IDR is nearly ***five hundred percent*** higher than the allowed payment rate established in Pennsylvania's Medicaid fee schedule.  Simply put, NorthStar's claim is fraudulent, wasteful and abusive per the HealthChoices Agreement.

94.    Moreover, Pennsylvania's Medicaid fee schedule is determined in part based on historic Medicaid expenditures.  Should United be required to pay higher amounts to providers who submit fraudulent claims to the NSA IDR, over time, those aggregated claims will result in the Commonwealth of Pennsylvania needing to allocate more money to insuring Medicaid

---

[49] *HealthChoices Agreement Physical Health Agreement*, 100 (Jan. 1, 2025), https://www.pa.gov/content/dam/copapwp-pagov/en/dhs/documents/providers/providers/documents/managed-care-information/2025-pa-ph-healthchoices-agreement-exhibits-and-non-rate-financial-appendices-final.pdf.
[50] *Id.* at 99.

beneficiaries in the long term.

## IV.    UNITED HAS NO ADEQUATE RECOURSE UNDER THE NSA

95.    As described herein, the NSA IDR system is broken.  Providers like NorthStar are intentionally submitting ineligible Medicare and Medicaid-related disputes to IDR in violation of the NSA.  And notwithstanding United's objections, IDREs are illegally exercising authority over the ineligible disputes and are issuing awards in favor of providers at indefensibly high amounts that not only exceed the QPA, but also eclipse (oftentimes by many multiples) the established Medicare and Medicaid rates for the services at issue.

96.    United has no adequate remedy without judicial relief from this court.  The Departments have provided "Technical Assistance" as to how errors in the NSA IDR process, including when IDREs rule that ineligible Medicaid and Medicare claims are eligible for the NSA IDR process, theoretically can be corrected.[51]  But that process is objectively insufficient.  It requires that the party raising the error first report it to the IDRE (the party who only gets paid if the dispute is eligible for IDR), who then decides if the error reported is of the type that permits reopening the dispute.  If so, the IDRE then reports the error to the Departments, who in turn must also determine if the error is redressable by way of this process.  If it is, the Departments then reopen the closed dispute to allow *the same IDRE who made the erroneous eligibility determination in the first place* to attempt to correct its decision.  If the IDRE determines that the claim was not in fact eligible, the IDRE must refund the IDRE fee *but the administrative fee is never refundable under any circumstances*.  Considering the volume of ineligible claims providers like NorthStar are submitting through the NSA IDR process, this multi-step dispute

---

[51] *Federal Independent Dispute Resolution (IDR) Technical Assistance for Certified IDR Entities and Disputing Parties*, Centers for Medicare & Medicaid Services (June 2025), https://www.cms.gov/files/document/idr-ta-errors-after-dispute-closure.pdf

resolution process is insufficient, particularly given that the administrative fees cannot be refunded.

## CAUSES OF ACTION

## COUNT I

## DECLARATORY JUDGMENT UNDER 28 U.S.C. §§ 2201, 2202

97.     United incorporates by reference as fully set forth herein the allegations in the preceding and succeeding paragraphs.

98.     There is an actual, substantial, and present controversy between United and Defendant concerning the amounts owed (if any) on the Pennsylvania Medicaid claim described herein.

99.     United and Defendant have adverse legal interests.

100.    United seeks judgment declaring that Defendant's conduct in initiating NSA IDR for an ineligible Medicaid claim was unlawful and fraudulent.

101.    Without such declaratory judgment, United could be required to pay the award determined by the IDRE for an ineligible Medicaid claim which never should have been submitted through the NSA IDR process in the first instance.

102.    United further seeks a declaration that Medicaid and Medicare claims are not eligible for NSA IDR, that IDREs have no authority or jurisdiction over such claims under the NSA, and that United is not obligated to pay illegal NSA IDR awards issued on ineligible Medicare or Medicaid claims, both retroactively and prospectively.

103.    Without such declaratory judgment, there is a real and substantial probability that NorthStar will continue to submit ineligible Medicaid and/or Medicare claims through the NSA IDR process and United may be required to pay IDRE awards, as well as IDRE and administrative fees for these ineligible claims.

104.    In addition to declaratory judgment, United seeks an injunction to prevent Defendant from continuing to submit false attestations and initiate the NSA IDR process for items or services that are not qualified for NSA IDR, or from seeking to enforce non-binding awards entered on items and services not qualified for the NSA IDR process.

105.    United and Defendant's rights related to the submission of Medicare and Medicaid claims through the NSA IDR process will be definitively decided through such declaratory and injunctive relief.

106.    Without declaratory and injunctive relief, United faces ongoing hardship in the form of being forced to (a) defend its payment of government-mandated amounts on ineligible Medicare and Medicaid claims through the NSA IDR process, (b) pay IDRE awards for ineligible claims, and (c) pay IDRE and administrative fees for ineligible claims for which no payment obligation rightfully exists under the NSA.

## COUNT II

## COMMON LAW FRAUD

107.    United incorporates by reference as fully set forth herein the allegations in the preceding and succeeding paragraphs.

108.    In initiating the dispute at issue here, NorthStar fraudulently attested, through its agent HaloMD, that: "I, the undersigned initiating party (or representative of the initiating party), attests that to the best of my knowledge…the item(s) and/or service(s) at issue are qualified item(s) and/or service(s) *within the scope of the Federal IDR process*."  (emphasis added).

109.    NorthStar submitted the IDR notice of initiation in the dispute with full knowledge of, or at the very least with reckless disregard to, the falsity of this attestation.  From the patient's insurance card, the PRA United submitted to NorthStar, the plain text of federal laws and regulations, CMS publications and resources, NorthStar's preparation of IDR initiation forms and

notices, NorthStar's participation in the IDR process, and the specific objections to eligibility that United submitted to NorthStar and the IDRE, among other sources, NorthStar knew that the dispute it was initiating was ineligible for the IDR process.

110.    NorthStar nevertheless submitted these false attestations and did so with the intent that the IDRE and United rely on them.  According to federal law, "the certified IDR entity selected must review the information submitted in the notice of IDR initiation" —including NorthStar's false attestations of eligibility— "to determine whether the Federal IDR process applies."[52]  Even though United contested eligibility, NorthStar's deliberate misrepresentation to the IDRE, on which the IDRE relied, forced United to rely on the misrepresentation because once the IDRE determined the dispute was eligible, United had no choice but to proceed with the process, submit a final offer, and watch helplessly as the dispute continued to a final payment determination.  Any other approach would have resulted in a default award against United for an amount likely to be many times the allowed Pennsylvania Medicaid rate.

111.    NorthStar's false attestations of eligibility pertain to material facts in the NSA IDR process because they go to the heart of the IDRE's jurisdiction to even hear the dispute.

112.    NorthStar submitted the false attestations to receive a windfall for itself, namely, IDR payment determinations in favor of NorthStar and against United regarding items or services that it knew were ineligible for resolution through the NSA IDR process.

113.    As a direct result of these misrepresentations by NorthStar, United has suffered damages in the form of payment of IDRE and administrative fees for a claim that was, at all times, ineligible for resolution through the NSA's IDR process.  United will suffer additional harm if it is required to pay the IDR award for this ineligible claim.

---

[52] 45 C.F.R. § 149.510(c)(1)(v).

114.    To date, NorthStar and its affiliated entities have submitted thousands of claims to the NSA IDR process and are continuing to do so, including the ineligible and fraudulent Medicaid claim described herein.  United stands to suffer additional ongoing harm if NorthStar is permitted to continue submitting ineligible and fraudulent claims through the NSA IDR process.

115.    United seeks damages and injunctive relief to enjoin Defendant from continuing to fraudulently submit false attestations and initiating the NSA IDR process for items or services that are not qualified for NSA IDR, or from seeking to enforce non-binding awards entered on items and services not qualified for the NSA IDR process.

## PRAYER FOR RELIEF

Wherefore, Plaintiff United respectfully requests that relief be entered in its favor as follows:

A.    Declare that Defendant's conduct in initiating NSA IDR for the ineligible Medicaid claim described herein was unlawful and fraudulent;

B.    Declare that Medicare- and Medicaid-related claims are not eligible for NSA IDR;

C.    Declare that IDR awards issued on unqualified items or services are non-binding and are not payable;

D.    Enjoin Defendant from continuing to submit false attestations and initiate the NSA IDR process for items or services that are not qualified for NSA IDR, or from seeking to enforce non-binding awards entered on items and services not qualified for the NSA IDR process;

E.    Award compensatory, punitive, and exemplary damages;

F.    Award costs, attorneys' fees, and interest;

G.     Grant such other and further relief as the Court deems just and proper.


Dated: December 19, 2025                 Respectfully submitted:
                                         */s/ Jordan Hughes*
                                         Jordan Hughes (PA Bar No. 330649)
                                         LATHAM & WATKINS LLP
                                         555 Eleventh Street, NW
                                         Suite 1000
                                         Washington, D.C. 20004
                                         Telephone: (202) 637-2200
                                         Email: jordan.hughes@lw.com

                                         David C. Tolley (*pro hac vice forthcoming*)
                                         William J. Trach (*pro hac vice forthcoming*)
                                         U. Gwyn Williams (*pro hac vice forthcoming*)
                                         LATHAM & WATKINS LLP
                                         200 Clarendon Street
                                         Boston, MA 02116
                                         Telephone: (617) 948-6000
                                         Email: david.tolley@lw.com
                                                william.trach@lw.com
                                                gwyn.williams@lw.com